**UNITED STATES of America, ex rel. Roland A. LeBLANC, Plaintiff,**

v.

**RAYTHEON COMPANY, INC., Defendant.**

**Civ. A. No. 88-2363-T.**

United States District Court, D. Massachusetts.

Jan. 25, 1990.

Amended Order Feb. 6, 1990.

MEMORANDUM

TAURO, District Judge.

Plaintiff, Roland LeBlanc, is a former Quality Assurance Specialist of the United States Government Defense Contract Administrative Service ("DCAS"). While so employed, he was stationed for eleven months at the Waltham, Massachusetts plant of defendant Raytheon Company, Inc. ("Raytheon"). There, LeBlanc allegedly observed several violations by Raytheon employees in their handling of government contracts. He reported these violations to his superiors at DCAS, and appropriate actions were taken.

In October 1988, eleven months after he was terminated by DCAS, LeBlanc brought this *qui tam*[1] action in the name of the United States, pursuant to the Federal False Claims Act,[2] to recover damages and civil penalties for Raytheon's alleged frauds against the United States. Under the False Claims Act, a *qui tam* suit must first be served on the United States, rather than the defendant. It is filed *in camera*, where it remains under seal for at least sixty days. 31 U.S.C.A. § 3730(b)(2) (West Supp.1989). Within those sixty days, the government has the option to intervene and take over the prosecution of the case. *Id.* If the government chooses to intervene, it becomes the primary responsible party, although the *qui tam* plaintiff, also known as the "relator," may still continue as a party. 31 U.S.C.A. § 3730(c)(1) (West Supp.1989). If the government chooses not to intervene, the relator then has the right to proceed with the case on his own with the hope of recovering a portion of any consequent damages and penalties. 31

James C. Heigham and James Roosevelt, Jr., Choate, Hall & Stewart, Boston, Mass., Charles Molineaux, Dempsey, Bastianelli, Brown & Touhey, Washington, D.C., for LeBlanc.

Robert L. Ashbaugh and Steven D. Aitken, U.S. Dept. of Justice, Washington, D.C., Peter Gelhaar, Asst. U.S. Atty., for U.S.

---

1. "Qui tam" comes from a longer Latin phrase meaning "who brings the action for the king as well as himself." *See Erickson v. American Institute of Bio. Sciences,* 716 F.Supp. 908, 909, n. 1 (E.D.Va.1989) citing W. Blackstone, *Commentaries on the Law of England* 160 (1768). A *qui tam* action is an action brought by an informer, pursuant to a statute, where a portion of the recovery goes to the informer and the remainder goes to the state. *Id.*

2. Title 31 U.S.C.A. § 3729 *et seq.* (West Supp. 1989).

U.S.C.A. §§ 3730(c)(3) and (d)(2) (West Supp.1989).

LeBlanc properly filed his suit with the government. The government ultimately chose not to intervene. But, in its Declination of Appearance, the government reserved "the right to object to the relator's right under 31 U.S.C. § 3730(d) to recover, if successful, a percentage of the proceeds from the prosecution of this action." *United States' Notice of Declination of Appearance*, p. 2.

Presently at issue is LeBlanc's motion to strike the government's reservation of the right to object to LeBlanc's recovery of proceeds. In support of his motion, LeBlanc argues that the recent revisions to the False Claims Act authorize his recovery of proceeds, regardless of his former status as a government employee. The government opposes the motion to strike, arguing that: 1) the motion is premature, rendering any court decision here a mere advisory opinion; and 2) the False Claims Act does not authorize government employees to file *qui tam* suits based solely on information obtained in the course of government employment.

## I.

■ The first issue to be addressed is whether this case presents a live "case or controversy" such that jurisdiction would be proper under Article III of the Constitution. *See Diamond, et al. v. Charles*, 476 U.S. 54, 61, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) ("Article III of the Constitution limits the power of federal courts to deciding 'cases' and 'controversies.'"); *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975) (justiciable case or controversy is a jurisdictional prerequi-

site). The government argues that, because it is not clear that the government will ever exercise its right to object to LeBlanc's recovery, the issue of whether LeBlanc is entitled to any proceeds is not a ripe "case" or "controversy." LeBlanc unfortunately fails to address this argument, and it is one that is ultimately dispositive.

The government has not officially objected to LeBlanc's recovery of proceeds from the proposed *qui tam* suit. It has merely reserved its right to do so. Where, as here, the challenged conduct is only threatened, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Los Angeles v. Lyons*, 461 U.S. 95, 101–2, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1982). *See also, Thomas v. Union Carbide Agricultural Products, Co.*, 473 U.S. 568, 580, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (ripeness doctrine prevents courts from "premature adjudication" of "abstract disagreements"). The determination as to whether a threat is sufficiently immediate to warrant a finding of jurisdiction is to be made by analyzing the underlying factual circumstances.[3]

There are three critical uncertainties that permeate the situation here. First, it is not clear that LeBlanc will even proceed with the suit. Second, it is problematical as to whether he will be successful if he does proceed. Third, it is an open question as to whether the government will object to LeBlanc's recovery, should he successfully prosecute the suit. In light of these several contingencies, the possible threat of a government objection is not sufficiently real and immediate to justify this court's jurisdiction.[4]

---

**3.** *Maryland Casualty Co. v. Pacific Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

**4.** *See Fagot v. Federal Deposit Insurance Corp.*, 584 F.Supp. 1168, 1179 (D.P.R.1984) ("[T]he alleged controversy cannot be based upon the possibility of a factual situation that may never

develop."). *See also Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (case not ripe where claim involves "contingent future events that may not occur as anticipated, or indeed may not occur at all."); *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937) (courts should avoid

The special circumstances of this case do not warrant a more permissive standard of ripeness analysis. Of course, the refusal of jurisdiction here may frustrate the purpose of the False Claims Act's *qui tam* provisions, which is to provide financial incentives that will encourage the exposure of frauds against the government. *See United States ex rel. LaValley v. First National Bank of Boston,* 707 F.Supp. 1351, 1355 (D.Mass.1988); S.Rep. No. 99–345, 99th Cong., 2d Sess. 3–4, *reprinted in* 1986 U.S.Code Cong. & Admin. News 5266–67. Faced with the possibility that the government might later object to his recovery of proceeds, a relator, like LeBlanc, may choose not to chance the costs of prosecution, because there would be no guarantee of a return on his investment. By holding that a relator may not establish his right to claim *qui tam* proceeds until the government actually objects to his recovery, this court may arguably chill the incentives that the False Claims Act sought to create. But, where the requirements of ripeness are not satisfied, jurisdiction may not be presumed merely because resolution of the substantive issue might advance a worthwhile policy goal. In another context, the Eleventh Circuit has stated:

> Needless to say, the decision makers would benefit greatly by having guidance as to the potential legal ramifications of their decisions. Furnishing such guidance prior to the making of the decision, however, is the role of counsel, not of the courts.

*Hendrix v. Poonai,* 662 F.2d 719, 722 (11th Cir.1981).[5]

Finally, it can also be argued that, rather than seeking coercive relief prematurely, LeBlanc's motion is, in fact, a request for a declaration that he is authorized to proceed under the False Claims Act. "[W]hen coercive relief only is sought but is deemed ungrantable or inappropriate, the court may *sua sponte*, if it serves a useful purpose, grant instead a declaration of rights." Fed.R.Civ.P. 57 (Declaratory Judgments), advisory committee's note.

This argument, however, falls prey to the same problems of ripeness noted above. Declaratory relief is one of a range of remedies available to a litigant. But, an independent basis for federal court jurisdiction must be established before a litigant is entitled to declaratory relief. *See Skelly Oil v. Phillips Petroleum Co.,* 339 U.S. 667, 671–72, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Colonial Penn Group, Inc. v. Colonial Deposit Co.,* 834 F.2d 229, 232 (1st Cir.1987) ("Federal jurisdiction does not lie simply because relief is requested under the federal Declaratory Judgment Act").

Moreover, when a plaintiff relies on a request for declaratory relief to engage in a preemptive strike against threatened action by the declaratory defendant, the "well-pleaded complaint rule" applies. *Greenfield and Montague Transp. Area v. Donovan,* 758 F.2d 22, 26 (1st Cir.1985). The rule, in this context, requires that:

> [w]here the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened ... action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court. If the cause of action, which the declaratory defendant threatens to assert, does not itself in-

issuing an "opinion advising what law would be upon a hypothetical state of facts."). *Cf. Eccles v. Peoples Bank,* 333 U.S. 426, 434, 68 S.Ct. 641, 92 L.Ed. 784 (1948) ("Where administrative intention is expressed but has not yet come to fruition ... we have held that the controversy is not yet ripe for equitable intervention.").

5. *See also,* 6A Moore's Federal Practice ¶ 57.12 (2d ed. 1989) ("[T]he requirements of justiciability are not met if the complainant merely alleges that he 'is at a loss to know what course to pursue.'") quoting *M & M Transportation Co. v. U.S. Industries, Inc.,* 416 F.Supp. 865 (S.D.N.Y. 1976).

volve a claim under federal law, it is doubtful if a federal court may entertain an action for a declaratory judgment establishing a defense to that claim.

*Greenfield and Montague* at 26–7, citing *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 248, 73 S.Ct. 236, 97 L.Ed. 291 (1952).

LeBlanc's motion is, in effect, an effort to put in play his defense to the government's threat of objection to his recovery. The government's threat, therefore, and not LeBlanc's request, must provide the basis for jurisdiction. And, as has already been noted, the government's threat depends upon the occurrence of too many contingencies to make it a live "case or controversy." Even if we cast LeBlanc's motion as a request for declaratory relief, therefore, there is no ripe controversy that would provide jurisdiction.

Accordingly, as LeBlanc's motion does not present an actual "case" or "controversy," it must be denied.

## II.

■ Even if LeBlanc's motion does present an actual "case or controversy," his *qui tam* complaint must be dismissed.

The False Claims Act bars *qui tam* suits by former government employees, based upon information they acquired in the course of their government employment.

Prior to 1986, the False Claims Act prohibited former government employees from bringing *qui tam* suits based on information acquired during the course of their government employment.[6] The False Claims Act was substantially amended in 1986[7], however, and its *qui tam* provisions were revised.[8] In its present form, the False Claims Act provides, in relevant part:

**(e) Certain actions barred** ...

... (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office Report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily

6. The pre–1986 version of 31 U.S.C. § 3730(d) provided that courts had no jurisdiction over *qui tam* suits "based on evidence or information the Government had when the action was brought." *See* former 31 U.S.C.A. § 3730(b)(4) (West 1983). That jurisdictional bar was included in the False Claims Act in 1943, in order to stem the tide of "parasitical actions" in which relators would base their litigation on information already secured by the government in the regular course of law enforcement. *See* Letter of Attorney General Biddle, *reprinted in* H.R. Rep. No. 263, 78th Cong. 1st Sess. 2 (1943). One of Congress's concerns at that time was that *qui tam* suits might induce government employees to investigate claims with an eye toward remuneration over and above that provided by their jobs. *Erickson, ex rel. United States v. American Inst. of Bio. Sciences,* 716 F.Supp. 908, 916, n. 18 (E.D.Va.1989).

7. False Claims Amendments Act of 1986, Pub.L. No. 99–562, 100 Stat. 3153 (1986).

8. The government concedes that the 1986 amendments came about because the jurisdictional bar was too broad. For example, the pre–1986 provisions prohibited suits by "honest informers" such as: 1) those who had independent information of fraud, which the government also happened to possess, and 2) "original sources" who gave the information to the government, but then found themselves barred by that very submission because, "at the time the suit was brought," the government possessed the information. *See United States ex rel. State of Wisconsin v. Dean,* 729 F.2d 1100 (7th Cir. 1984); *United States ex rel. LaValley v. First National Bank of Boston,* 707 F.Supp. 1351, 1355 (D.Mass.1988).

provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C.A. § 3730(e)(4) (West Supp.1989).

Only one case, *Erickson, ex rel. United States v. American Institute of Biological Sciences,* 716 F.Supp. 908 (E.D.Va.1989), has addressed the issue of whether the 1986 amendments to the False Claims Act removed the jurisdictional bar against government employees.[9] The court in *Erickson* concluded that, although the False Claims Act, as amended, does not expressly address this question, the language, structure, legislative history, and purpose of the amendments reveal a legislative intent to permit government employees to sue under the False Claims Act. 716 F.Supp. at 918.

The court noted that the amended statute permits any "person" to sue, unless he falls into one of four specifically excluded groups.[10] It concluded that the *qui tam* plaintiff there, under facts similar to the case at bar,[11] did not fall into any of the four excluded groups. *Id.* at 914. According to *Erickson,* not even § 3730(e)(4) excluded the relator, because he was the "original source" of the information. *Id.*[12]

This court agrees with the conclusion in *Erickson* that the Act was specifically amended to allow *all* persons to sue, un-less they fall into § 3730(e)'s four excluded classes. But this court disagrees with *Erickson's* determination that government employees are not excluded under the terms of the statute.

Government employees are excluded by § 3730(e)(4) of the False Claims Act. That section prohibits suits based on the "public disclosure" of government information. 31 U.S.C.A. § 3730(e)(4) (West Supp.1989). Because government employees maintain a dual status—arms of the government while at work, private citizens while not at work—a "public disclosure" necessarily occurs whenever a government employee uses government information he learned on the job to file a *qui tam* suit in his private capacity.[13]

Moreover, a former government employee like LeBlanc cannot qualify for the "original source" exception to § 3730(e)(4)'s jurisdictional bar. An "original source" is defined in the statute as:

... an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

9. The government cites one other case which held, according to the government, that government employees are still barred from suing under the False Claims Act. Because that case remains under seal, however, this court cannot properly consider it.

10. Title 31 U.S.C. § 3730(e) specifically bars the following four groups of suits: 1) suits between members of the military (§ 3730(e)(1)); 2) suits against members of Congress, the Judiciary, or senior Executive officials if the action is based on evidence or information known to the government when the action was brought (§ 3730(e)(2)); 3) suits based on allegations which are the subject of a civil suit in which the government is already a party (§ 3730(e)(3)); and 4) suits based on the public disclosure of allegations in a public proceeding, unless the person suing is the original source of the information. (§ 3730(e)(4)). *See supra* for full text of § 3730(e)(4).

11. Erickson worked for a State Department Agency, and his job was to ensure that a private laboratory's contract with the agency was properly administered. Erickson discovered violations of the contract and reported the misconduct directly to his supervisor. When the agency for which he worked declined to pursue the matter, he filed a *qui tam* suit.

12. The *Erickson* court drew further support from the FFCA's "whistleblower" provision, § 3730(h), in which the definition of "employer" was intended to include public as well as private entities. *Id.* at 914. The court derived from this the implication that government employees are specifically included in the class of people Congress desires to have aid in enforcement of the anti-fraud laws generally.

13. This argument was not addressed in the *Erickson* case.

31 U.S.C.A. § 3730(e)(4)(B) (West Supp. 1989). LeBlanc was not someone with "independent knowledge of the information." Rather, he was a government employee whose responsibility it was to uncover such information. Because gaining the information was required of him as a condition of his employment, the fruits of his effort belong to his employer—the government. For purposes of the proffered information, the government and LeBlanc were indistinguishable, as opposed to individual entities. Given his status, LeBlanc did not provide information to the government "voluntarily," under the terms of the statute. Rather, he reported the information to the government in response to the obligations of his employment.

The interpretation of § 3730(e)(4) followed here is consistent with Congressional intent.[14] The "original source doctrine" was designed to bridge Congress' competing goals of preventing opportunistic lawsuits while at the same time encouraging the disclosure of information otherwise unavailable to the government. *See U.S. ex rel. Stinson, et al. v. Provident Life &*

*Accident Ins. Co.,* 721 F.Supp. 1247, 1250 (S.D.Fla.1989) citing 132 Cong.Rec. S11244 (daily ed. Aug. 11, 1986) (statement of Sen. Grassley).

A lawsuit by a former government employee based on information he obtained soley through his employment can fairly be construed as "opportunistic." The relator in such a context would profit from information already obtained at the taxpayers' expense. In other words, permitting former government employees to bring *qui tam* actions based upon information they discovered on the job would allow them to be paid twice for the same work. That is not what Congress had in mind.[15] *Cf. United States ex rel. Marcus v. Hess,* 317 U.S. 537, 560, 63 S.Ct. 379, 392, 87 L.Ed. 443 (1943) (Jackson, J., dissenting).[16]

A bar to suits by government employees, present or former, is consistent with the balance of goals that the "original source doctrine" sought to achieve. While Congress intended to expand the class of eligible relators, it maintained its interest in

---

**14.** The ambiguity of terms of art such as "public disclosure" and "original source" requires that the terms be construed in light of the objects and policies of the statute as a whole. *See Stafford v. Briggs,* 444 U.S. 527, 535, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980) (courts should look beyond literal use of terms, to objects and policies of statute as a whole); *United States v. McGoff,* 831 F.2d 1071, 1078 (D.C.Cir.1987) ("The settled approach for interpreting [terms of art] is ... not one emphasizing ordinary meaning.").

**15.** Indeed, permitting government employees to bring such *qui tam* suits would contravene other official expressions of the policy against "opportunism." For example, President Johnson issued an executive order in 1965 which provided:

Sec. 203. Employees may not (a) have direct or indirect financial interests that conflict substantially, or appear to conflict substantially, with their responsibilities and duties as Federal employees, or (b) engage in, directly or indirectly, financial transactions as a result of, or primarily relying upon, information obtained through their employment ...

Sec. 205. An employee shall not directly or indirectly make use of, or permit others to make use of, for the purpose of furthering a private interest, official information not made available to the general public.

Exec.Order No. 11222, 30 Fed.Reg. 6469 (1965), *reprinted in* 1965 U.S.Code Cong. & Admin. News 4385, and 18 U.S.C. § 201 note. Additionally, Title 18 U.S.C.A. § 208(a) (West Supp.1989) imposes criminal penalties upon any employee who "participates personally and substantially as a Government officer or employee, through ... investigation ... in ... [any] particular matter in which, to his knowledge, he ... has a financial interest...." While neither of these examples is directly applicable, they serve to reinforce the government's policy against the opportunistic uses of government information.

**16.** At the heart of the government's arguments is the concern that permitting government em-

preventing parasitical suits which add nothing to the enforcement of anti-fraud laws.[17] A suit brought by a government employee based on frauds discovered in the course of his employment adds nothing to the enforcement process.[18] To be consistent with Congress' intent, § 3730(e)(4) must be interpreted to ban all *qui tam* suits based on government information, unless the individual bringing the suit acquired his knowledge of the fraud in his private capacity.[19] *Qui tam* suits, such as LeBlanc's, that are based upon information discovered in the course of government employment, therefore, are barred.

An order will issue.

ployees to sue will result in unseemly races to the courthouse between government employees and the government, and may discourage government employees from furthering investigations of fraud for fear of losing control over information on which a suit may be brought.

These same concerns were raised by Justice Jackson in his dissent in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). In construing the original 1863 False Claims Act, the majority of the *Marcus* Court concluded that, not only did the Act permit suits by "any person," but "even a district attorney, who would presumably gain all knowledge of a fraud from his official position, might sue as the informer." 317 U.S. at 546, 63 S.Ct. at 385. Justice Jackson criticized the majority, saying:

> To accept the view ... that today law-enforcement officials could use information gleaned in their investigations to sue as informers for their own profit, would make the law a downright vicious and corrupting one.... If we were to add motives of personal avarice to other prompters of official zeal the time might come when the scandals of law-enforcement would exceed the scandals of its violation.

*Id.* at 560, 63 S.Ct. at 392.

Indeed, the 1943 amendment creating a blanket exclusion for government employees was passed largely in response to the majority's conclusion in *Marcus*. *See Erickson* at 915–16; *U.S. ex rel. LaValley v. First Nat. Bank of Boston*, 707 F.Supp. 1351, 1354 (D.Mass.1988).

**17.** The 1986 amendments arose largely out of the recognition that the government's own en-

## AMENDED ORDER

TAURO, District Judge.

For the reasons stated in *United States of America, ex rel. Roland A. LeBlanc v. Raytheon Company, Inc.*, CA No. 88–2363–T (D.Mass. Jan. 25, 1990) (memorandum) (Tauro, J.), plaintiff-relator LeBlanc's Motion To Strike United States' Reservation Of Rights is hereby DENIED for failure to present an actual "case or controversy."

Alternatively, because this *qui tam* suit is jurisdictionally barred by § 3730(e)(4) of the Federal False Claims Act, 31 U.S.C.

forcement of anti-fraud laws was inadequate and required the assistance of private citizens. *See United States ex rel. LaValley v. First National Bank of Boston*, 707 F.Supp. 1351, 1355 (D.Mass.1988); S.Rep. No. 99–345, 99th Cong., *reprinted in* 1986 U.S.Code Cong. & Admin. News 5267 (Congress sought to "increase incentives for *private* individuals to bring suit.") (emphasis added). The amendments still maintained the jurisdictional bar of "parasitical suits" with which the 1943 version of the Act was concerned, however. *Id.* at 1356.

**18.** In the case of the private relator, the government's enforcement is enhanced, at the outset. Even though a suit *after* the private relator has disclosed the information pursuant to § 3730(e)(4) adds nothing new to the government's body of information, the initial disclosure of the information did add something. The government obtained information that it did not have before, because the individual had no prior obligation to turn over his information to the government. Conversely, at *no* point in the *qui tam* proceeding does a government employee add to the government's body of information. In his capacity as a government employee, the relator was acting as an arm of the government. When he discovered the fraud in the course of his employment, therefore, it was the *government* that discovered the fraud. His subsequent "voluntary" disclosure pursuant to § 3730(e)(4), therefore, adds nothing to what the government already knew.

**19.** For example, the "original source" exception in § 3730(e)(4) contemplates a situation in

§ 3729 *et seq.*, this action is hereby DISMISSED.

IT IS SO ORDERED.

which a private citizen discovers a fraud, reports it to government authorities, and the information is somehow publicly disclosed. Notwithstanding the public disclosure, the private individual may still maintain his suit because he, as a private citizen, originally discovered the fraud.